William **RILEY**

v.

**CITY OF CHESTER and Joseph F. Battle, Mayor of the City of Chester, and John Owens, Chief of Police of the City of Chester,**

**Geraldine Oliver, a witness for the Plaintiff, Appellant.**

No. 79–2528.

United States Court of Appeals, Third Circuit.

Argued Nov. 2, 1979.

Decided Dec. 14, 1979.

Joseph F. Lawless, Jr., Petrikin, Wellman, Damico & Carney, Media, Pa., Francis J. Sullivan, Fairless Hills, Pa., for appellant Geraldine Oliver.

Samuel E. Klein, Joseph F. Roda, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for amici-intervenors, Bucks County Courier Times, etc.

Arthur Levy, Levy & Surrick, Media, Pa., for City of Chester and others.

John M. Gallagher, Jr., Richard, Brian, DiSanti & Hamilton, David R. Black, Media, Pa., for appellee William Riley.

Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF COURT

SLOVITER, Circuit Judge.

This is an appeal by Geraldine Oliver, a staff writer for the Delaware County Daily Times for approximately 26 years, who was adjudged by the district court to be in civil contempt because, when questioned by counsel for the plaintiff in a civil action pending in the district court, she refused to identify the source of her information for a newspaper article she wrote. This case raises the question of the circumstances in which a reporter can be compelled to disclose the source of her news stories.

## I.

## FACTS

1. The action in the court below was filed on October 19, 1979 by William Riley, a policeman employed by the City of Chester, who was a candidate for mayor in the election to be held November 6, 1979. Defendant Joseph F. Battle is the mayor of the City of Chester and was also a candidate for reelection as mayor.[1] Defendant John Owens is Chief of Police of the City of Chester. The complaint, which was filed pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, alleges that defendants and other employees of the City of Chester violated plaintiff's constitutional rights with respect to his freedom to conduct his campaign for public office by practices which include surveillance of the plaintiff, conducting investigations of plaintiff's performance of duties as a Chester policeman, and public announcement of those investigations. Plaintiff sought a preliminary injunction in the court below restraining defendants from their surveillance of his person and residence and from conducting spurious investigations of his performance as a policeman.

2. A hearing on the motion for preliminary injunction was held in the trial court on October 29, 1979 and October 30, 1979. In the course of that hearing the order of civil contempt which is the subject of this appeal was entered.

3. As part of his testimony in support of the motion for preliminary injunction, plaintiff Riley stated that there were leaks to the press with respect to internal investigations conducted by the Police Department after he had become a candidate for mayor, that the newspaper articles reporting information from his police personnel file contained some inaccurate information, that he never authorized anyone to release such information and that no one asked his permission. (TR 1–9, TR 1–15–26). Plaintiff submitted as exhibits a series of newspaper articles which, *inter alia*, referred to various investigations.

4. Immediately following Mr. Riley's testimony, plaintiff called as a witness the appellant, Geraldine Oliver, and the following questioning, relevant to this appeal, took place:

BY MR. BLACK:

Q   Ms. Oliver, what is your occupation?

A   I am a staff writer for the Delaware County Daily Times.

Q   How long have you written for the Daily Times?

A   Between 26 and 27 years to the best of my knowledge.

Q   Have you in any way, shape or form covered the election for the office of Mayor in the City of Chester in 1979?

A   As a side bar perhaps. Only as a staff writer on general assignment.

Q   As a staff writer on the newspaper.

A   Right.

\*   \*   \*   \*   \*   \*

BY MR. BLACK:

Q   Ms. Oliver  .   .   .   I ask you to refer to what His Honor has directed me to mark as P–2–A.[2]

---

1. Mayor Battle was reelected as mayor in the November 6, 1979 election.

2. P–2–A was the article which was the basis of the questions to appellant and is reproduced here verbatim:

A  Well, P–2–A is the same article you referred to before and it is in the Delaware County Daily Times, and I did in fact write that article.

Q  You did in fact write it.

Did you write it at the time, on August 21, 1979?

A  On or about that date, yes. I'm not sure of the date of the publication. I would have written it the day before publication. [The article was published on August 22, 1979.]

\* \* \* \* \* \*

Q  Did you observe Mr. Riley's personnel record?

A  No.

Q  What was the source of your—

THE COURT: You say you didn't observe. You mean you didn't actually physically examine or look at the personnel record?

MR. BLACK: Yes. That is the question, Your Honor.

THE WITNESS: I did not.

BY MR. BLACK:

Q  What was the source of your information?

MR. LAWLESS: Objection.

Riley's record blemished
*By GERRY OLIVER*
*Daily Times Staff Writer*
CHESTER—A lazy memory about drivers' licenses isn't the only thing that darkens the record of Patrolman William S. Riley, an outspoken critic of the fallen John H. Nacrelli regime in city hall for the last two years.

According to the record, which Riley claimed a week ago to be unblemished, he has been suspended, docked, officially reprimanded and internally investigated on several occasions through his 13 years on the force.

[1] Police Chief Hamilton confirmed that there has been a continuing investigation of Riley's absences from work.

"His sick time seems often to coincide with his days off," the chief reported.

[2] FORMER Police Chief William Hoopes who was demoted after testifying in the trial that convicted Nacrelli of accepting payoffs to protect gambling operations in the city recommended a three-day suspension of Riley on June 20, 1977, for failure to report for work, according to the record.

A  I cannot answer that.
(TR 1–104–107).

The basis on which Ms. Oliver refused to answer that question was the First Amendment and the Pennsylvania Shield Law, 42 Pa.Cons.Stat.Ann. § 5942.

5. Although plaintiff's counsel argued that the Pennsylvania Shield Law was inapplicable and that the privilege should not apply, he did not move to cite appellant for contempt. The trial court directed that appellant answer and when she refused again, sua sponte cited appellant for civil contempt (TR 1–114). Later that day the court issued a Memorandum and signed the written Order of contempt.

6. Plaintiff's next witness, Chester Police Department Inspector Timothy Gill, who is involved in internal police investigations, testified that he had been requested to investigate Mr. Riley three times. The first time the request was made by retired Chief Hamilton on July 13, 1979, with respect to an investigation he was conducting regarding leaks of confidential information from the Police Department about rental cars being used by vice officers and raids being conducted by the Vice Unit. The second investigation was ordered by Chief Hamilton on August 21, 1979 in regard to Riley's failure to have a proper Pennsylva-

[3] A year earlier on Jan. 7, 1976, the late Police Chief Herbert (Bud) Wright placed in Riley's file a letter of reprimand for "failure to fill out and file a complaint of criminal mischief in the W. 7th St. parking lot." According to that report, Riley later apologized to the complainant for failure to respond to either problem.

[4] ON JULY 14, 1975, a report to Chief Wright by Captain Walter Hoyle cited Riley because he "presented a non-professional appearance and does quite a bit of flirting with the women." At that time he was removed from traffic duty.

[5] As far back as Nov. 27, 1972, Riley was suspended from duty upon recommendation of Captain Hoyle to former Police Chief Joseph Bail. According to that report, Riley was away from his post at 5th and Edgmont for an hour and 40 minutes. When he was reprimanded by Hoyle who came out and covered the post during Riley's absence, Hoyle said "I may be forced to send you home" and, according to the report, Riley responded "well, send me home." (numerals added).

nia driver's license, and the third investigation, ordered by Chief John Owens, related to reports in a Philadelphia Bulletin article that Riley has brought bootleg whiskey into the State of Pennsylvania. (TR 1–119–126; TR 1–136–137). He also testified that before May of this year, he had investigated Riley with respect to some other matters, including the use of sick days (TR 1–127) and the failure to take a citizen's complaint report (TR 1–139–140). Inspector Gill was questioned about the confidentiality of the investigation reports and testified as follows:

BY MR. BLACK:

Q Well, let me ask you this, Inspector Gill: Are you personally authorized to release information concerning investigation of a policeman for say abuse of sick time?

A No, sir.

Q Are you personally authorized to release publicly information concerning your investigation of a policeman for an incident like having whisky from out of state at a political rally?

A I don't release any information, sir.

Q Who else besides yourself, Inspector, investigates internal police matters?

A There is different grades of investigations in Department, O.K.?

Some of them can be immediately handled by a supervisor, and some go on further.

There are two other inspectors besides myself. Inspector Iacono and Inspector William Hoopes.

From time to time there have been internal investigations. The Chief of Police has the authority—I am certain he does—he can assign detectives or anyone else that he feels can do the job and he will do this from time to time.

I got to fully state to you in the past three to four months most of my work has been tied up in other matters other than internal investigations, and I have been very busy, and I am sure there were numerous investigations that the Chief of Police

handed out to other inspectors or other officers in the Department.

MR. BLACK: Thank you, Inspector. That is all I have.

(TR 1–130–131).

Plaintiff's counsel did not seek from Inspector Gill the identity of any of the other persons who had access to the files regarding these investigations.

7. Plaintiff then called Gwendolyn McKinney, a staff reporter for the Philadelphia Tribune, who testified that Mayor Battle and Riley himself were the sources of her newspaper articles concerning police investigations into Riley's conduct (TR 2–10–34). Ms. McKinney noted that her articles actually attributed statements of those investigations to Mayor Battle (TR 2–11).

8. Plaintiff's next witness was Mayor Joseph F. Battle, who admitted making statements to reporters (TR 2–54–59, TR 2–73–77), including Geraldine Oliver (TR 2–66–73), and also admitted that most of the newspaper reports attributed to his statements regarding investigations of officer Riley were accurate, although he stated that there were times when the newspaper articles did not report his statements exactly as he said them (TR 2–60, 2–65). Mayor Battle specified that he had informed reporters about allegations of Riley's misbehavior including alleged sick leave abuses (TR 2–57–60, 2–73), possible election campaign violations (TR 2–62), unauthorized use of work time for coffee breaks (TR 2–69–70) and leaks of police information to the press (TR 2–52–56). With respect to his conversations with Geraldine Oliver, he testified "I answered her inquiry, because every time I go in the police station somebody calls the reporters and then I get a flood of calls. But, I answer every reporter's call, and I tell them the truth whatever it is." (TR 2–72).

9. Thereafter Michael Hobbs, a reporter from The Philadelphia Inquirer, testified that Mayor Battle was one of the sources of information used by him in writing newspaper articles concerning internal police department investigations of Riley, and that

at times Mayor Battle would call him with information and that at times he would call Mayor Battle requesting information. (TR 2–98–102). The newspaper article which was the subject of Mr. Hobbs' testimony attributes the information to Mayor Battle.

10. Plaintiff's final witness was John Michael Roman, general assignment reporter for the Delaware County Daily Times, who testified that he prepared an article on the investigation by Battle of Riley's use of sick leave days from information supplied to him by Mayor Battle (TR 2–131–133). That article attributes the source of the information to Mayor Battle.

11. Plaintiff made no attempt to call as a witness defendant John Owens, Chief of Police of the City of Chester.

12. At the conclusion of the hearing on the second day, counsel for the defendants moved to dismiss the plaintiff's application for preliminary injunction "for failing to establish the necessary basis factually and legally to obtain such an injunction." (TR 2–157–158). The court responded:

I have no intention of issuing a preliminary injunction unless something more is added to this record than is presently on it. And that means the testimony that we haven't heard from Miss Oliver. I can do nothing. I will not issue a preliminary injunction, nor will I deny one at this point. I will not dismiss the complaint, not until I have heard Miss Oliver's testimony.

Of course, if the court of appeals does not act before next Tuesday, since all that is sought before me is a preliminary injunction designed to control certain aspects of the conduct of the defendants as it bears upon the upcoming election, the whole matter may become moot as of next Tuesday. But, I have no choice in the matter.

(TR 2–158–159).

13. On October 30, 1979 appellant applied to this court for bail pending appeal from the adjudication of civil contempt and requested, in the alternative, an order staying execution of the adjudication of civil contempt pending appeal. By Order dated October 30, 1979, the execution of the contempt order was stayed pending further order of the panel of this court. The appellant, Geraldine Oliver, and the intervenors, Bucks County Courier Times and First Amendment Coalition, then moved for a summary reversal of the Order of the district court adjudging Ms. Oliver in comtempt. Riley in turn moved for summary affirmance of the adjudication of civil contempt. At the hearing on November 2, 1979, which was originally scheduled on the Motion for bail and for a stay, the parties consented to expand the hearing to encompass the motions for summary affirmance and summary reversal, thereby placing before this court the merits of the civil contempt order.

14. On November 2, 1979 we filed the following order:

On the appellant's motion for summary reversal, IT IS ORDERED, ADJUDGED and DECREED that the order appealed from be and is hereby reversed. An opinion in support of this judgment will be filed hereafter.

## II.

### DISCUSSION

■ Rule 501 of the Federal Rules of Evidence provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501.

The complaint in the action pending in the district court was filed under a federal

statute, and therefore we are required to interpret federal common law insofar as it applies to the claimed privilege of a reporter. The legislative history of Rule 501 manifests that its flexible language was designed to encompass, *inter alia,* a reporter's privilege not to disclose a source. The original draft of the Rule defined nine specific nonconstitutional privileges, but failed to include among the enumerated privileges one for a reporter or journalist. The Advisory Committee gave no reason for the omission.[3] This was one of the primary focuses of the congressional review of the proposed evidentiary rules, stemming in part from the "nationwide discussions of the newspaperman's privilege."[4] Following testimony on behalf of groups such as the Reporters Committee for Freedom of the Press,[5] the privilege rule was revised to eliminate the proposed specific rules on privileges and to leave the law of privilege in its current state to be developed by the federal courts.[6]

Where a witness claims a privilege founded on the First Amendment of the Constitution, our "reason and experience" directs us in the first instance to that Amendment. In *Branzburg v. Hayes,* 408 U.S. 665, 707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court acknowledged the existence of First Amendment protection for "newsgathering". The interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring. A journalist's inability to protect the confidentiality of sources s/he must use will jeopardize the journalist's ability to obtain information on a confidential basis. *Baker v. F & F Investment,* 470 F.2d 778, 782 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Zerilli v. Bell,* 458 F.Supp. 26, 28 (D.D.C.1978). This in turn will seriously erode the essential role played by the press in the dissemination of information and matters of interest and concern to the public. The role of "an untrammeled press as a vital source of public information", *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936), was one of the primary bases for its First Amendment protection. "The press was to serve the governed, not the governors. . . . The press was protected so that it could bare the secrets of government and inform the people." *New York Times Co. v. United States,* 403 U.S. 713, 717, 91 S.Ct. 2140, 2143, 29 L.Ed.2d 822 (1971) (Black, J., concurring).

The limitation imposed by the Court in *Branzburg v. Hayes* on the ability of a journalist to refuse to disclose information is not applicable to the facts in this case. There, the Supreme Court decided that a journalist does not have an absolute privilege under the First Amendment to refuse to appear and testify before a grand jury to answer questions relevant to an investigation into the commission of crime. No Supreme Court case since that decision has extended the holding beyond that which was necessary there to vindicate "the public interest in law enforcement and in ensuring effective grand jury proceedings." 408 U.S. at 690, 92 S.Ct. at 2661.

**3.** Advisory Committee's Notes, H.R.Doc. No. 46, 93d Cong. 1st Sess. 78 (1973).

**4.** Rules of Evidence, Hearings Before the House Special Subcomm. on Reform of Federal Criminal Laws of the Comm. on the Judiciary, 93d Cong., 1st Sess. 5 (Rep. Holtzman).

**5.** *Id.* at 367.

**6.** S.Rep. No. 1277, 93d Cong., 2d Sess. 11 (1974); H.Rep. No. 650, 93d Cong., 1st Sess. 8 (1973). *In Matter of Grand Jury Impaneled January 21, 1975,* 541 F.2d 373, 379 n.11 (3d Cir. 1976), we referred to the following comment by Congressman Hungate, the principal draftsman of the Federal Rules of Evidence:

> For example, the Supreme Court's rule of evidence contained no rule of privilege for a newspaperperson. The language of Rule 501 permits the courts to develop a privilege for newspaperpeople on a case-by-case basis. The language cannot be interpreted as a congressional expression in favor of having no such privilege, nor can the conference action be interpreted as denying to newspaperpeople any protection they may have from State newsperson's privilege laws.

> 120 Cong.Rec.H 12253–54 (daily ed. Dec. 18, 1974) (explaining the final Conference Report version of the Rules).

The strong public policy which supports the unfettered communication to the public of information, comment and opinion and the Constitutional dimension of that policy, expressly recognized in *Branzburg v. Hayes,* lead us to conclude that journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources. Such a privilege has also been recognized by many other courts which have considered this question following the decision in *Branzburg v. Hayes. See, e. g., Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 436 (10th Cir. 1977); *Baker v. F & F Investment, supra; Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.,* 455 F.Supp. 1197, 1203 (N.D.Ill.1978); *Zerilli v. Bell, supra; Altemose Construction Co. v. Building & Construction Trades Council,* 443 F.Supp. 489, 491 (E.D.Pa.1977); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505, 508 (E.D. Va.1976).

In recognizing such a privilege, we may consider also the applicable state law, in this case Pennsylvania's Shield Law, 42 Pa. Cons.Stat.Ann. § 5942, which provides that:

> (a) General rule.—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

The Conference Report with respect to Rule 501, although noting that in federal court in non-diversity jurisdiction civil cases "federal privilege law will generally apply", also referred to language in the concurring opinion of Justice Jackson in *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 471, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942), that:

> A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some *cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect,* but in the last analysis its decision turns upon the law of the United States, not that of any state. (emphasis added).

Although we are not bound to follow the Pennsylvania law, neither should we ignore Pennsylvania's public policy giving newspaper reporters protection from divulging their sources. Pennsylvania regards newspapers as "the principal guardians of the general welfare of the Community" who are "in the best sense of the maxim, 'pro bono publico'." *In re Taylor,* 412 Pa. 32, 40, 193 A.2d 181, 185 (1963). Pennsylvania's concern that newspapers be encouraged and protected in their newsgathering and communications functions was expressed by its highest court:

> We would be unrealistic if we did not take judicial notice of another matter of wide public knowledge and great importance, namely, that important information, tips and leads will dry up and the public will often be deprived of the knowledge of dereliction of public duty, bribery, corruption, conspiracy and other crimes committed or possibly committed by public officials or by powerful individuals or organizations, unless newsmen are able to *fully and completely* protect the sources of their information. It is vitally important that this public shield against governmental inefficiency, corruption and crime be preserved against piercing and erosion.

*Id.* The interests behind the Pennsylvania statute and the federal common law in this regard are congruent, each stemming from an independent base of authority but both leading to protection of the vital communication role played by the press in a free society.

It is nonetheless no longer open to question that there are countervailing interests which will suffice to transcend the journalist's privilege to refuse to divulge sources. A determination of the specific circumstances in which the privilege will be required to yield to a paramount interest must be made on an *ad hoc* basis. Justice

Powell, who cast the deciding vote in *Branzburg v. Hayes,* wrote:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The *balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.* (Emphasis added).

408 U.S. at 710, 92 S.Ct. at 2671. As was noted in *Altemose Construction Co. v. Building & Construction Trades Council,* 443 F.Supp. at 491, "Such a case-by-case analysis is mandated even more in civil cases than in criminal cases, for in the former the public's interest in casting a protective shroud over the newsmen's sources and information warrants an even greater weight than in the latter." (Higginbotham, J., now Circuit Judge).

■ When a privilege is grounded in constitutional policy, a "demonstrated, specific need for evidence" must be shown before it can be overcome. *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Therefore, we must balance on one hand the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case at hand.

■ In considering the applicability of the policies of the privilege in this case, we consider first the circumstances in which the issue arose. This is not a case where the reporter witnessed events which are the subject of grand jury investigations into criminal conduct. *See e. g., Branzburg v. Hayes, supra.* This is not a situation where the reporter is alleged to possess evidence relevant to a criminal investigation. *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). This case does not place in apposition the journalist's privilege and the constitutional right of a criminal defendant to be afforded every reasonable opportunity to develop and uncover exculpatory information. *See e. g., New York Times Co. v. Jascalevich,* 439 U.S. 1317, 99

S.Ct. 6, 10, 58 L.Ed.2d 25 (1978) (White J., in chambers). This is not a case where a reporter waived the privilege by filing suit to vindicate his own rights. *See, e. g., Anderson v. Nixon,* 444 F.Supp. 1195 (D.D. C.1978). Nor is this a situation in which the journalist and/or publisher are defendants in a suit brought for damages caused by publications alleged to have contained knowing or reckless falsehoods. *See, e. g., Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). This is simply a situation where a journalist has been called as a witness to a civil suit in which neither she nor her employer has any personal interest. The news stories were concededly written by her in the course of her newspaper employment on matters of public interest concerning a candidate for high public office in a hotly contested campaign. In fact, plaintiff in the trial court did not claim that the substantive facts alleged in the petitioner's news stories were actually untrue, although it is clear plaintiff would have preferred that they remained unpublicized. Under the circumstances, plaintiff must demonstrate why his interest in civil litigation, although brought to vindicate his significant constitutional right to participate freely and without undue hindrance in a public election, is dependent upon the information sought.

■ In striking the delicate balance between the assertion of the privilege on the one hand and the interest of either criminal or civil litigants seeking the information the materiality, relevance and necessity of the information sought must be shown. *See e. g., New York Times Co. v. Jascalevich,* 439 U.S. 1331, 99 S.Ct. 11, 14, 58 L.Ed.2d 38 (1978) (Marshall, J., in chambers). All courts which have considered this issue have agreed that the federal common law privilege of news writers shall not be breached without a strong showing by those seeking to elicit the information that there is no other source for the information requested. *See e. g., Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433 (10th Cir. 1977); *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94

S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Baker v. F & F Investment, supra; Altemose Construction Co. v. Building & Construction Trades Council, supra; Loadholtz v. Fields,* 389 F.Supp. 1299 (M.D.Fla.1975); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78 (E.D.N.Y.1975); *Democratic National Committee v. McCord,* 356 F.Supp. 1394 (D.D.C. 1973).

The requisite balance cannot be made without a showing "as to the effort to obtain [the information] from other sources." *Silkwood v. Kerr-McGee Corp.,* 563 F.2d at 438. The party seeking the information must show "that his only practical access to crucial information necessary for the development of the case is through the newsman's sources." *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. at 510. Plaintiffs must show that they exhausted other means of obtaining the information. *Zerilli v. Bell,* 458 F.Supp. at 29. The material sought must "provide a source of crucial information going to the heart of the [claim]. . . ." *Gulliver's Periodicals, Ltd. v. Charles Levy Circulating Co.,* 455 F.Supp. at 1204.

█ The trial court recognized that it had an obligation to take these factors into account. In adjudicating Ms. Oliver to be in civil contempt, the judge stated that he had considered "the nature of the case, the relevance and materiality of the information sought to be adduced; whether the information sought goes to the heart of and is crucial to the claims made by the party seeking to elicit the information and the issues framed by the pleading; and the availability of the information from other sources." With respect to the "availability of the information from other sources", the trial court merely noted that "the information sought, namely the identity of the persons who gave out the allegedly false and inaccurate information, is extremely crucial to the claims made by the plaintiff and the issues framed by the pleading, *i. e.,* whether the defendants have acted deliberately to harass the plaintiff in his quest for public office; and I have considered from the testimony thus presented that the information

appears not to be available from other sources." *Riley v. City of Chester,* No. 79–3783 (E.D.Pa. Oct. 29, 1979) (Memorandum).

The trial court's findings contain only a general assertion of necessity. The conclusory statements fall far short of the type of specific findings of necessity which may overcome the privilege.

A review of the record shows a number of reasons why the trial court's conclusions of necessity, even if they were considered findings of fact, are clearly erroneous. At the time appellant was adjudged to be in contempt, no witness had testified other than the plaintiff. The court had not yet had the opportunity to hear the testimony of defendant Battle and that of the other reporters; no inquiry had been made into the identity of other persons who had access to plaintiff's personnel file and who may have been the source of the "leak" of information; and no attempt was made to elicit testimony from the other defendant, John Owens, Chief of Police of the City of Chester, who clearly would have been someone with access to the personnel file. Quixotically, plaintiff's counsel who questioned Mayor Battle in detail during the hearing never asked him if he was the source of the information which appeared in appellant's news story. Plaintiff's failure to have taken this most obvious opportunity to elicit the information he claimed to need from appellant is particularly surprising since Mayor Battle, when testifying, candidly admitted that he was the source of much of the information which appeared about plaintiff in various press stories (TR 2–52–53; TR 2–69; TR 2–72), and freely admitted responding to appellant's questions about her news stories (TR 2–72). In fact, Battle admitted speaking to the press about plaintiff's sick leave abuses (TR 2–73, TR 2–76–77), one of the items of information that appeared in appellant's story. Plaintiff's effort to elicit the information from appellant regarding her source should fail on this ground alone, since plaintiff did not exhaust the most patently available other source.

■ It is important to view the information requested, the source of appellant's news story, in the context of the other testimony in this case. The news story in question refers to five instances of internal investigation, suspension or reprimand of plaintiff Riley during his 13 years on the force. One of those instances was confirmed by a source named in the news story itself. (See paragraph [1] of Ex. P–2–A, note 2 *supra*). Defendant Battle admitted he had leaked similar stories to the press (TR 2–73, 76–77). The other incidents and investigations referred to, such as for failing to report to work, failing to complete a complaint for criminal mischief, nonprofessional behavior and flirting, and being absent from his post for an hour and forty minutes, do not differ in kind or degree from the incidents which appeared in other news stories and which defendant Battle admitted discussing with newsmen, such as Riley's unauthorized coffee breaks taken during work time (TR 2–69, 72). This hardly rises to the standard of need required before a privilege rooted in the First Amendment should be set aside and a journalist sentenced for contempt for adhering to the principles of her profession.

Of most significance, the information sought to be disclosed appears to have only marginal relevance to the plaintiff's case. The suit charges that defendants, in order to hinder and impede plaintiff's efforts to conduct his election campaign, harassed plaintiff by keeping him under surveillance and conducting repeated investigations into his job performance. The news story referred to investigations completed long before the election campaign began. The situation here closely approximates that referred to by Judge Kaufman in *Baker v. F & F Investment,* 470 F.2d at 784, where he found that appellants had "not demonstrated that the identity of [journalist's] confidential source is necessary, much less critical, to the maintenance of their civil rights action."

Finally, the interests referred to earlier compel us to call for restraint in the judicial imposition of sanctions on the press. Cf. *United States v. Steelhammer,* 539 F.2d 373, 375 (4th Cir. 1976). Because of the importance to the public of the underlying rights protected by the federal common law news writer's privilege and because of the "fundamental and necessary interdependence of the Court and the press" recently referred to by Justice Brennan,[7] trial courts should be cautious to avoid an unnecessary confrontation between the courts and the press. Although there may be cases in which the confrontation is inevitable, this was clearly not one of them.

---

7. Address by William J. Brennan on the Dedication of Samuel I. Newhouse Law Center, Rutgers University, Newark, N. J. (October 17, 1979).