**STATE of Delaware,**

v.

**Derek M. ROGERS, Defendant.**

**DEF. I.D. No. 0112016209.**

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 28, 2003.

Decided: March 3, 2003.

Amended & Corrected: March 4, 2003.

Martin B. O'Connor, Deputy Attorney General, Department of Justice, Wilmington, for the State of Delaware.

Chad M. Shandler, Richards, Layton & Finger, Wilmington, for Terry Sanginiti and The News Journal.

Dade D. Werb, DelCollo and Werb, P.A., Newark, for the Defendant.

## MEMORANDUM OPINION

SLIGHTS, J.

### I. INTRODUCTION

The State of Delaware has subpoenaed a reporter from The News Journal Company ("The News Journal") to testify at trial regarding statements purportedly made by the defendant, Derek Rogers ("Rogers"), during an interview with the reporter conducted within hours of the shooting and attempted robbery at issue in this case. The reporter, Terri Sanginiti ("Sanginiti"), has moved to quash the subpoena on the ground that she enjoys a qualified privilege to refuse to testify under the First Amendment to the United States Constitution,[1] and the Delaware State Constitution's counterpart, Article I, Section Five.[2]

In what appears to be a case of first impression, the Court must address the whether Delaware's Reporter's Privilege Act[3] ("the Act") applies when a reporter

seeks to protect the content of information provided by a known and identified source.[4] Sanginiti has argued that the Act only applies when a reporter seeks to protect the identity of a confidential source. She contends that it does not apply when the reporter seeks protection from compelled disclosure of information (as opposed to the source of the information) discovered while a reporter is investigating a story, particularly when the information is not published in the story itself. The claim of privilege under these circumstances, she contends, is governed solely by principles grounded in the First Amendment which have developed over time in federal, including United States Supreme Court, jurisprudence.

For the reasons stated below, the Court concludes that the Act governs all claims of privilege advanced by news reporters in this State, whether the privilege is invoked to protect the identity of confidential sources or the information obtained from known and identified sources. The Act requires the Court to balance the public's interest in having the reporter's testimony presented at trial against the public's interest in keeping the reporter's information confidential. After balancing these competing interests in this case, the Court concludes that the privilege afforded Sanginiti under the Act must give way to the public's interest in having her testimony presented at trial. Accordingly, the motion to quash is **DENIED**.

### II. FACTS

Rogers is on trial facing charges of Attempted Robbery, Assault First Degree

---

1. U.S. Const. amend. I.

2. Del. Const. of 1897, art. I, § 5 (amended 1999).

3. Del. Code Ann. tit. 10, §§ 4320–4326 (1999)(hereinafter, references to specific sections of the Act shall be "Section ").

4. The parties have indicated that they are unaware of any Delaware decision that addresses this issue, and the Court has found none.

and related weapons offenses arising from an aborted liquor store robbery during which the store owner was shot and critically injured.[5] Shortly after the robbery, Sanginiti arrived at the scene to report the incident for The News Journal. She interviewed several bystanders, including Rogers. Portions of the Rogers interview were reported in The News Journal the following day. Rogers was quoted as saying that he often sat in the liquor store to keep the owner of the store (the victim) company. Rogers was photographed standing in front of the liquor store with Jeff Cunningham ("Cunningham"), another neighborhood man who was interviewed for the article. The photograph appeared in the newspaper along with Sanginiti's article.

Several days later, Rogers was interviewed by the Wilmington Police Department. He denied any involvement in the shooting and told the chief investigating officer that he was cleaning out a basement with a work crew across town at the time of the shooting.

After the victim regained consciousness, she identified Rogers as the shooter. When the police developed information which suggested to them that Roger's alibi was fabricated, they arrested him. The News Journal ran a story the following day which focused on the fact that Rogers had been interviewed on the day of the shooting as a bystander and had expressed admiration and concern for the victim throughout the interview. Additional portions of the interview were quoted or paraphrased in the follow-up article, including Rogers' statement that he was usually sitting in the liquor store visiting with the

owner but was "away" the morning of the shooting. The article concluded with facts related to the police investigation and arrest of Rogers and a brief statement from the victim's son.

On February 19, 2003, six days prior to the start of this trial, the prosecutor spoke with Sanginiti about the articles she had written related to this case. During the course of the conversation, the prosecutor maintains that Sanginiti advised him that Rogers had told her he was "at the hospital" at the time of the shooting. Her follow-up article had simply reported that Rogers said he was "away" when the shooting occurred but had not mentioned specifically where he claimed to be.

The State has issued a subpoena *ad testificandum* for Sanginiti. The prosecutor has proffered two limited areas of inquiry: (1) the date, time and location of the Rogers interview; and (2) Rogers' statement that he was at the hospital at the time of the shooting. As to both subjects, the State argues that Sanginiti's testimony will impeach Rogers' alibi.[6] The State would argue that Rogers could not have been cleaning out a basement across town if he was giving an interview to Sanginiti in front of the scene of the crime very soon after it was committed. That he told Sanginiti he was at the hospital at the time of the shooting undermines his alibi even further. Sanginiti has moved to quash the subpoena as a violation of the reporter's privilege.

## III. DISCUSSION

### A. The Parties' Contentions

Sanginiti contends that she enjoys a presumptive privilege to decline to testify about the content of her article or any

---

5. The trial is in its third day as of this writing.

6. Rogers' interview with the police was videotaped. The tape was played during the State's case-in-chief so the jury has now

heard Rogers state that he was cleaning out a basement until late afternoon or early evening on the day of the shooting.

unpublished material she developed during her investigation of the story. She argues that the reporter's privilege is grounded in the First Amendment and the federal jurisprudence which has refined the criteria for the privilege. And she contends that the Act does not apply here because she is not seeking to protect a confidential source but rather is seeking to protect information she received from an identified source. Finally, she argues that the State has failed to overcome the privilege with a showing of compelling need for her testimony or the unavailability of her information from another source.

The State questions whether a reporter's privilege even exists in the common law. It points to Unites States Supreme Court authority for the proposition that, absent extraordinary circumstances not present here, a reporter does not enjoy a presumptive privilege to refuse to respond to a valid subpoena compelling documents or testimony. The only reporter's privilege that may be invoked, according to the State, is the privilege codified in the Act. Because Sanginiti has not satisfied her burden to establish the existence of the privilege, as required by the Act, she must comply with the subpoena. Moreover, the State contends that it has amply demonstrated its need for Sanginiti's testimony and that it cannot get her information elsewhere.

### B. Does the Act Apply?

Sanginiti did not even mention the Act in her moving papers. At oral argument,

she contended that the Act did not apply here because its reach is limited to situations where a reporter is seeking to protect a confidential source. Although unable to cite a case directly supporting this proposition, Sanginiti argued that the Delaware courts which have addressed the reporter's privilege in the context of subpoenas compelling testimony regarding information (as opposed to sources) do not mention the Act.[7] These decisions analyze the reporter's privilege by first recognizing in the common law a reporter's "qualified privilege to refuse to disclose unpublished material in his possession," and then employing a three-part balancing test, as articulated by a line of cases from the United States Court of Appeals for the Third Circuit to determine if the privilege should be upheld.[8]

■ Sanginiti correctly observes that no Delaware decision reviews the reporter's privilege in the context of the Act. Judge Fraczkowski has noted that the principles articulated in the federal jurisprudence "have found favor with the Delaware Legislature since the reasoning is basically incorporated in the Delaware's Reporter's Privilege Act."[9] He did not, however, engage in an analysis of the Act. *Fuester*, likewise, does not address the Act, but it is clear in that case that the parties focused their presentations on the federal standards and did not argue the Act to the court.[10] After reviewing the Act and the

---

7. *See Fuester v. Conrail*, C.A. No. 91C–09–013, 1994 WL 555526, Ridgely, P.J. (Del.Super.Sept. 16, 1994) (Mem. Op.); *State v. McBride*, IK08–05–0058, 7 Media L. Rep. 1371, et. al., Wright, J. (Del.Super. May 6, 1981) (Letter Op.); *State v. Hall*, No. M–88–10–1948, 16 Media L. Rep. 1414, Fraczkowski, J. (Del.Mun.Ct. Mar. 8, 1989) (Mem. Op.).

8. *See, e.g., Fuester*, slip op at 4–5 (citing *United States v. Criden*, 633 F.2d 346 (3d Cir.

1980); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980); *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979)).

9. *State v. Hall, supra*, Letter Op. at 3.

10. Counsel for Sanginiti represented at oral argument that he had reviewed the briefs in *Fuester* and had confirmed that neither party mentioned the Act in their papers.

Delaware cases cited by Sanginiti, the Court is satisfied that the absence of a Delaware case applying the Act to a reporter's claim of privilege is not evidence that the Act does not apply. Clearly, it does.

In Delaware, the analysis of a claim of privilege advanced during trial must begin with Delaware's rules of evidence. D.R.E. 513, entitled "reporter's privilege," provides: "A reporter may not decline to testify except as provided by statute." The comment to the rule then casts the spotlight directly on the Act: "There is no similar rule in [the federal rules of evidence]. Thus the rule is needed because of 10 *Del. C.* §§ 4320–4326, the Delaware Reporter's Privilege Act."

The Act itself reveals no legislative intent to limit• its application to claims of privilege relating to source information only. To the contrary, the Act casts a net wide enough to capture all claims of privilege. In its definition section, the Act distinguishes "information" from "sources." [11] "Information" is defined as "any oral, written or pictorial material and includes, but is not limited to, documents, electronic impulses, expressions of opinion, films, photographs, sound records, and statistical data." [12] "Source" is defined, in part, as "a person from who a reporter obtained information...." [13] When defining the privilege for purposes of an "adjudicative proceeding," [14] such as a trial, the Act provides:

> "A reporter is privileged in an adjudicative proceeding to decline to testify con-

cerning the *source or content of information* that he or she obtained within the scope of his or her professional activities if the reporter states under oath that the disclosure of the information would violate an express or implied understanding with the source under which the information was originally obtained or would substantially hinder the reporter in the maintenance of existing source relationships or the development of new source relationships." [15]

Sanginiti's limited reading of the Act simply cannot be reconciled with the capacious language of the statute. The Act does not apply only to claims of privilege relating to sources; it applies to both the "source or content of information." The Court can discern no basis to construe the Act otherwise, and Sanginiti has offered none.

At oral argument, when the Court indicated its inclination to apply the Act, Sanginiti floated the proposition that the Act did not comport with the First Amendment or the free press provision of Delaware's Constitution. The Court is compelled to observe at the outset that Sanginiti's constitutional challenge is mounted with little grace. A fellow News Journal reporter, represented by the same law firm, previously argued in this Court that the Act *was* constitutional when it was raised as a shield to protect the reporter from revealing a source in the course of a libel action against the reporter. [16] The Court agreed and upheld the

---

11. *See* Section 4320(2) & (5).

12. Section 4320(2).

13. Section 4320(5).

14. The Act distinguishes claims of privilege made during "adjudicative proceedings" -- "judicial ... proceedings in which the rights of parties are determined" -- and "non adjudi-

cative proceedings." *Compare* Section 4321("privilege in nonadjudicative proceedings") with Section 4322("privilege in adjudicative proceedings").

15. Section 4322(emphasis supplied).

16. *Riley v. Moyed,* 1985 WL 549253 (Del.Super.).

Act as constitutional.[17] Moreover, there is a presumption favoring constitutionality; it is overcome only by proof demonstrating "unconstitutionality ... *beyond all reasonable doubt.*"[18] No such proof has been proffered here. The Act is constitutional.

■ The Act also comports with the common law. Here again, tenets of statutory construction guide the Court's analysis. "There is a presumption that a statute is consistent with the common law, and so a statute creating a new remedy or method of enforcing a right which existed before is regarded as cumulative rather than exclusive of the previous remedies."[19] Nothing in the Act contradicts the common law. Indeed, if anything, the Act is complemented by the common law.

■ First and foremost, the Act codifies a qualified reporter's privilege.[20] In the context of an adjudicative proceeding, in order to activate the privilege, the reporter must swear that the privilege is necessary either to protect an existing source or her ability to "develop[ ] new source relationships."[21] This requirement is entirely consistent with the purpose of the reporter's privilege as articulated in the case law. The reporter's privilege addresses "the concern that requiring testimony ... would have a chilling effect on the gathering and dissemination of information in the news media."[22] To the extent the reporter's testimony in a given case would not potentially "chill" the news gathering process, the First Amendment

is not implicated and the privilege should not apply. The Act recognizes this by requiring the reporter to articulate under oath in what manner compelled testimony in a given case would hinder the free flow of information in the press. The party who has issued the subpoena may then challenge the veracity of the reporter's explanation and request the Court to make a finding with respect to whether the privilege should apply.[23] This process is entirely consistent with the First Amendment and the common law which has developed to articulate the reporter's privilege.

The Act next provides a process by which the party issuing the subpoena to the reporter may overcome the qualified privilege in a particular case. This process, likewise, mirrors the common law. In *Riley*, the Third Circuit outlined a three-part test to determine whether the qualified privilege should give way to the parties' right to present relevant evidence at trial.[24] To overcome a motion to quash, the moving party must establish: (1) "that an attempt was made to obtain the information from other sources;" (2) "the only access to the information is through the journalist and the requested material;" and (3) "the information is crucial to the claim."[25] The Act also provides a means to balance the competing interests, albeit with slightly different language. At Section 4323(a), the Act provides:

> Unless the disclosure of the content of the information would substantially in-

---

17. *Id.*

18. 2A Sutherland *Statutes & Statutory Construction* § 45:11 at 66 (6th Ed.2000).

19. 2B Sutherland *Statutes & Statutory Construction* § 50:05 at 162 (6th Ed.2000).

20. Section 4322.

21. *Id.*

22. *State v. Hall, supra,* Letter Op. at 2 (citation omitted).

23. *See* Section 4323(b).

24. *Riley,* 612 F.2d at 717.

25. *Fuester, supra,* Mem. Op. at 5 (citing *Riley* and *United States v. Criden,* 633 F.2d at 358).

crease the likelihood that the source of the information will be discovered, the privilege provided by § 4322 shall not prevent a reporter from being required in an adjudicative proceeding to testify concerning the content, but not the source, of information that the reporter obtained within the scope of his or her professional activities if the judge determines that the public interest in having the reporter's testimony outweighs the public interest in keeping the information confidential. In making this determination, the judge shall take into account **the importance of the issue on which the information is relevant, the efforts that have been made by the subpoenaing party to acquire the evidence on the issue from alternative sources, the circumstances under which the reporter obtained the information, and the likely effect that disclosure of the information will have on the future flow of information to the public.**[26]

■■■■ The respect for and protection of a free press is no less evident in the Act

than in those cases which recognize the qualified reporter's privilege. The Act does not diminish the protections of the qualified privilege; it simply provides a process by which the courts in Delaware should enforce the privilege. The Act is a properly enacted and constitutional law of this State. The courts of Delaware are obliged to apply it.

Before the Court applies the Act in this case, it is appropriate to address the State's contention that, at least in the common law, a qualified reporter's privilege may not exist. Sanginiti's motion cites to the Third Circuit's clear precedent in which the reporter's privilege is firmly settled. Yet the State correctly observes that the federal circuit courts are not uniform in their endorsement of the privilege or in their interpretation of the arguably opaque United States Supreme Court precedent on the issue.[27] Not only are there differing views among the federal circuit courts as to whether a qualified reporter's privilege exists,[28]the various circuit courts which do recognize the privilege do not

---

**26.** Section 4323(a)(emphasis supplied).

**27.** For instance, at least one Justice of the United States Supreme Court has unequivocally questioned whether a "newsman's ... obligation to obey an otherwise valid subpoena is conditioned upon the showing of special circumstances." *New York Times Company v. Jascalevich*, 439 U.S. 1301, 1302, 98 S.Ct. 3058, 58 L.Ed.2d 9 (1978)(White, J., in chambers)(writing alone on a motion to stay a state trial court order denying a motion to quash subpoena, Justice White stated his view that the United States Supreme Court had not recognized a reporter's privilege in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)). In *Branzburg*, the Court, in a 5–4 decision, refused to recognize a qualified reporter's privilege to protect confidential source information in the context of a grand jury hearing. Justice Powell, in his concurrence, stated that the "courts will be available to newsmen under circumstances where legitimate First Amendment interests

require protection." *Id.* at 710, 408 U.S. 665. Justice Powell's concurrence in *Branzburg* is the authority most frequently cited by those federal circuit courts which have recognized the reporter's privilege.

**28.** *Compare, United States v. Burke*, 700 F.2d 70, 77 (2d Cir.1983) (recognizing qualified reporter's privilege and citing *Branzburg*); *United States v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir.1980) (same); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir.1986) (same), with *In re Shain* 978 F.2d 850, 852–53 (4th Cir.1992) (absent evidence of harassment or lack of good faith, a qualified reporter's privilege does not exist); *In re Grand Jury Proceedings*, 810 F.2d 580 (6th Cir.1987) (same). The Eighth Circuit remains undecided on this issue. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 918 n. 8 (8th. Cir.1997) (noting that whether *Branzburg* establishes a qualified reporter's privilege is an "open issue").

concur on its scope.[29] The Court has highlighted these discrepancies to make an important point: as the saying goes, "Sanginiti should be careful what she asks for." The existence and scope of the qualified reporter's privilege in the common law is, at best, unsettled. In Delaware, however, our General Assembly has embraced the concept and has provided a detailed road map for its application. The Act settles the question for Delaware reporters: the qualified reporter's privilege is alive and well in Delaware.

### C. Does Sanginiti Enjoy A Qualified Reporter's Privilege In This Case?

As stated, Sanginiti did not even mention the Act in her motion to quash. It is not surprising, then, that she did not offer the sworn statement required by Section 4322.[30] Because Sanginiti was not present at the hearing on the motion, the Court granted her leave to supplement her motion with an affidavit addressing the issues contemplated by the Act.[31] She has now done so. She has averred that her compelled testimony in this case would ad-versely affect her ability to develop and maintain new source relationships.[32]

In determining whether Sanginiti has met her burden under Section 4322, the Court cannot overlook the nature of the information being sought here. Sanginiti interviewed a man who claimed to have information regarding the victim of a crime. Her interview subject was quite willing to reveal his identity; indeed, he posed for a photograph which was published along side excerpts from his interview. When it was later discovered that the man who had been interviewed (Rogers) had been arrested for the shooting, The News Journal ran a story about this rather unusual development. In her second story, Sanginiti included additional excerpts from the interview to make the point that Rogers had provided her with information which was entirely inconsistent with his involvement in the crime. In one portion of the story, Sanginiti reports that Rogers claimed he "was away [the] morning [of the shooting]." According to the State, Sanginiti has now revealed that this vague

---

29. *See, e.g., United States v. La Rouche Campaign,* 841 F.2d 1176, 1181 (1stCir.1988) (noting that it is more difficult to establish policy grounds for the privilege when no confidential information is sought); *Criden,* 633 F.2d at 358 (privilege easier to overcome in criminal cases and more difficult to overcome in civil cases); *Zerilli v. Smith,* 656 F.2d 705, 716 (D.C.Cir.1981) (courts require a lesser showing where the journalist is a party to the lawsuit rather than a third-party witness); *United States v. Smith,* 135 F.3d 963, 972 (5th Cir.1998)(privilege protects only source information not content information).

30. She did, however, supply an affidavit from Calvin J. Stovall, Managing Editor of The News Journal. While Mr. Stovall's affidavit does address how and why compelling a reporter to testify may adversely affect the news gathering process, he is not the reporter subject to the subpoena in this case. His affidavit does not meet the requirements of Section 4322.

31. The Court is satisfied that an affidavit from the reporter will, in most cases, be sufficient to meet the Act's requirement that the reporter support her claim of privilege with a "statement under oath" in accordance with Section 4322. In appropriate cases, the court may direct the reporter to supplement her affidavit with sworn testimony.

32. *See* Sanginiti Aff. ¶¶ 5–10. Sanginiti emphasized the importance of objectivity in the news gathering process: "The risk of becoming a participant through compelled testimony, and thereby losing the appearance of objectivity, would consequently chill in substantial fashion the news gathering process." *Id.* ¶ 6. Furthermore, Sanginiti predicts that if journalists are not protected from litigants' demands to testify and produce documents, "subpoenas to the press [will] become a routine element of litigation." *Id.* ¶ 10.

reference in the story apparently was the product of editorial license. In fact, Rogers had advised Sanginiti that he was "at the hospital" at the time of the shooting.[33] It is this "unpublished material" that Sanginiti seeks to protect from disclosure.

While it is certainly understandable that the State would challenge the existence of the privilege -- or, more specifically, the existence of a "chilling" effect on the news gathering process -- under the scenario presented here, the Court will assume, without specifically deciding, that Sanginiti has carried her burden to establish that her compelled testimony in this case may "hinder" her ability to develop and maintain news sources in the future. The Court will again consider this scenario, however, when addressing "the likely effect that disclosure of the information will have on the future flow of information to the public," as per Section 4323(a).

### D. Has The State Carried Its Burden To Overcome The Privilege?

■ The Act directs the Court to balance the competing interests when a reporter seeks to quash an otherwise valid subpoena.[34] At oral argument, the State acknowledged that once the Court determines that the reporter has carried her initial burden under Section 4322, and has survived a challenge to the veracity of her sworn statement under Section 4323(b), the burden rests with the "subpoenaing party" to demonstrate that the balance

tips in favor of "the public interest in having the reporter's testimony."[35]

■ The Act does not state that any one of the factors will be dispositive. Rather, the court is directed to consider the factors together and to balance the competing interests with all of the factors in mind. Although the burden of proof is not addressed specifically in Section 4323(a), the burden of proof imposed under Section 4323(b) is proof by a preponderance of the evidence. The Court sees no reason why the burden should be any different with respect to the analysis required by Section 4323(a), particularly when the statute itself refers to a balancing of competing interests where the court is to determine which interest "outweighs" the other in a given case.

### 1. The Importance of the Issue on Which The Information is Relevant

Sanginiti has argued that the whereabouts of Rogers at the time of the shooting is not important because this fact does not relate to an "element of the crimes" charged. This argument misapprehends the State's burden in this case. Rogers does not dispute that an attempted robbery and assault first degree occurred on the morning of December 19, 2001 at the JP Liquors store. Instead, he argues that the State will not be able to prove beyond a reasonable doubt that he is the man who committed these crimes. Identity, then, is

---

**33.** It is not surprising that The News Journal editors would omit Rogers' explanation of his specific location as this has no bearing at all on the point of the story. It was enough to say that Rogers was claiming that he was not at the scene of the shooting to make the point that he had therefore been quite comfortable to speak with a reporter at a time when presumably he knew he was the shooter.

**34.** *See* Section 4323(a).

**35.** *Id.* In this criminal case, in addition to considering the public's interest, it is also appropriate for the Court to consider the defendant's constitutional right to a fair trial and the alleged victim's right to a full and fair search for the truth. *See Riley,* 612 F.2d at 716(noting that reporter's privilege may deserve less weight in the context of a criminal investigation or criminal trial).

not just an "important issue," it appears that it may be the **only** issue in this case.

The jury has heard Rogers videotaped statement to the police in which he stated that he was cleaning out a basement across town at the time of the shooting. If, in fact, Rogers told Sanginiti that he was at the hospital at the time of the shooting, this testimony would directly contradict his alibi and would, therefore, be relevant to the most important issue in the case. The State has tipped the scale in its favor with respect to this issue.

## 2. The State's Efforts To Acquire The Information From Alternative Sources

The State learned of Sanginiti's information six days prior to trial. Since then, the State has tracked down Cunningham, the man who appeared with Rogers in Sanginiti's first article and in The News Journal photograph. Cunningham has submitted an affidavit in which he states that he did not hear the substance of Rogers' interview with Sanginiti on December 19. At oral argument, the State argued that this was sufficient to carry its burden to establish that the information -- Rogers' statements to Sanginiti -- was not available from an alternative source.

For her part, Sanginiti argued that the State should be required to issue subpoenas to surrounding hospitals,[36] canvass the neighborhood again for witnesses who may have heard Rogers offer a contradictory alibi,[37] and, at a minimum, question the witnesses identified in the article as to whether they may have heard Rogers offer a contradictory alibi at any time before or after his interview with Sanginiti. At the

time of oral argument, none of these steps had been taken.

If the circumstances were different here, the Court would agree with Sanginiti that to prevail on this factor, the State ought to be required to do more than seek out a single witness (Cunningham) to confirm that he did not overhear the Rogers/Sanginiti interview. If another witness heard Rogers provide an alibi different than the one he provided to the police, that witness could testify and Sanginiti's testimony arguably would be unnecessary. Yet, in this case, on less than a week's notice, the Court is not inclined to require the State to subpoena unidentified hospitals or to conduct a canvass of the neighborhood surrounding the liquor store to find unknown or unidentified witnesses to events which occurred more than a year ago. The State's effort to find Cunningham on such short notice is commendable. It demonstrates a sensitivity on its part to the privilege and a desire to locate alternative sources for the information. And while this effort may not be sufficient in every case, the Court is satisfied that in this case, where the information sought is not confidential and is barely unpublished, the effort will suffice.

Finally, the Court must reject Sanginiti's contention that her information is available to the State either through the articles themselves or, potentially, through Rogers. With respect to the articles, they are hearsay and would not be admissible at trial.[38] As to the notion that Rogers might admit that he made the statement to Sanginiti when he testifies, it would not be prudent at this stage to assume that Rogers will testify at all, much less to predict

---

**36.** She did not define a geographical range to which these subpoenas should be directed, nor specifically identify exactly what information should be requested in these subpoenas.

**37.** Again, the proposed scope of this canvass was not specifically articulated.

**38.** *See Larez v. City of Los Angeles,* 946 F.2d 630, 642 (9th Cir.1991).

what he would say if he elected to do so. In any event, Rogers has already "testified" in the form of his videotaped statement and in that statement he provided an alibi which was different than the one he purportedly provided to Sanginiti. The State need not wait for a rebuttal that may never occur to provide evidence which may contradict Rogers' exculpatory statement to the police.

### 3. The Circumstances Under Which The Reporter Obtained The Information

This factor weighs heavily in favor of the State. As best as the Court can tell, Sanginiti arrived at the scene of a crime shortly after it occurred, uncertain what she would find. She encountered bystanders who more than willing to speak with her on the record. Two of the bystanders consented to appear in a photograph in which they were depicted standing directly in front of the scene of the crime. When Rogers was arrested, Sanginiti revealed even more of her interview with Rogers in a follow-up article, the focus of which was to highlight how a man now accused of shooting a store clerk had voluntarily spoken to a reporter shortly after the shooting and had expressed concern for the very victim he had now been accused of nearly killing.

Disclosure of Sanginiti's information will not betray a confidential source. It will not require her to disclose a portion of a news story which had intentionally been kept confidential by the reporter or the newspaper. Indeed, the scenario presented here, in essence, will require Sanginiti simply to confirm that the information contained in her story is accurate.[39] To the extent she would be asked to reveal "unpublished" material, the information she will be asked to disclose is hidden only by a more expedient choice of words in the story. This factor weighs in favor of the State.

### 4. The Likely Effect That Disclosure of the Information Will Have On the Future Flow of Information to the Public

When evaluating a claim under the reporter's privilege, the Court must not lose sight of the big picture. The need to preserve a free press is compelling and well settled in Delaware.[40] It is deeply rooted in the First Amendment and in the Constitution of the State of Delaware.[41] It is comforting, then, that the Act directs the Court to consider the extent to which compelling a reporter to testify about certain information may affect her ability to gather and report information in the future. The Court has considered this question here and has concluded with little difficulty that compelling Sanginiti to disclose the time, date and location of her interview with Rogers, and his statement regarding his whereabouts at the time of the shooting, will not adversely affect her ability, or the ability of her fellow news reporters, to gather and report information in the future. The information sought by the State will reveal nothing more of substance about her interview of Rogers than she has already reported to the public, with Rogers' consent, in her two articles. When a news source freely volunteers his identity, consents to attribution,

---

**39.** *See Securities and Exchange Comm'n v. Seahawk Deep Ocean Tech.,* 166 F.R.D. 268, 271–72 (D.Conn.1996)(denying motion to quash subpoena when the reporter was to be asked only to confirm the accuracy of the information published in his story).

**40.** *See In re Opinion of the Justices,* 324 A.2d 211, 213 (Del.1974).

**41.** *See Fuester, supra,* Mem. Op. at 4.

and places no restrictions on the use of the information he has provided, it can reasonably be inferred that he has abandoned any expectation of confidentiality. The Court can discern no basis to conclude that a potential news source would be discouraged from cooperating upon learning that a reporter was compelled to testify about information she had obtained from a known and identified source and had then reported with attribution in two newspaper articles.

## IV. CONCLUSION

The Court has engaged in the analysis required by Delaware law and has determined that Sanginiti cannot avail herself of the qualified reporter's privilege in this case. In reaching this conclusion, the Court has recognized that the qualified reporter's privilege exists, that the common law interpreting the privilege complements the privilege recognized in the Act, and that the privilege serves an important function in preserving and protecting a free press. Yet in this case, the nature of the information which is sought by the State's subpoena, and the circumstances under which the information was obtained, compel the conclusion that the qualified reporter's privilege must give way to the public's right to a full and fair trial in this criminal case where all relevant information is presented to the fact finder for use in its search for the truth. Accordingly, the motion to quash is **DENIED**.

Sanginiti shall appear to testify at trial on Tuesday, March 4, 2003 at 9:30 a.m.

**IT IS SO ORDERED.**