**In re Grand Jury Subpoena of Janet WILLIAMS.**

**In re Grand Jury Subpoena (PITTS-BURGH POST–GAZETTE).**

**In re Grand Jury Subpoena of WPXI, INC., Cox Enterprises, Inc.**

**In re Grand Jury Subpoena (WESTING-HOUSE BROADCASTING).**

**Misc. Nos. 16973 to 16975 and 16990.**

United States District Court,
W.D. Pennsylvania.

May 8, 1991.

W. Thomas McGough, Jr., Debra H. Dermody, Sean M. Coleman, Reed Smith Shaw & McClay, Pittsburgh, Pa., for Pittsburgh Post–Gazette.

Scott E. Henderson, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Janet Williams.

Walter P. DeForest, Pittsburgh, Pa., for WPXI, Inc.

George E. Yokitis, Steven Baiker–McKee, Babst, Calland, Clements & Zomnir, P.C., Pittsburgh, Pa., for Westinghouse Broadcasting.

Paul J. Brysh, Asst. U.S. Atty., Pittsburgh, Pa.

## MEMORANDUM OPINION

LEE, District Judge.

Presently before the Court are the Motions of Janet Williams and the Pittsburgh Press Company, Michael Bucsko and the Pittsburgh Post–Gazette, WPXI, Inc., and Westinghouse Broadcasting Company, Inc., t/d/b/a KDKA–TV, to quash subpoenas *duces tecum* requiring them to produce documents relating to the now completed criminal trial of *United States v. Charles Porter, et al.*, Criminal No. 90–35, Western District of Pennsylvania, received by them from a person or persons whom the Government seeks to identify.[1]

Immediately prior to the closing arguments in the *Porter* trial, the Government learned that copies of Federal Bureau of Investigation reports (FD–302's) produced for the use of defense counsel in the *Porter* trial were distributed to various members of the news media. The Presiding Judge had issued an Order prior to the commencement of the trial restricting the disclosure or dissemination of any *Jencks* and *Brady* material which would include copies of the FD–302's distributed to defense counsel.

The FD–302's describe interviews with one Marvin "Babe" Droznek, a Government witness, who related rumors of corruption of various public officials, including a retired Federal Judge.[2]

The Government immediately advised the Presiding Judge, Honorable Donald E. Ziegler, who entered an *ex parte* Order directing various members of the media to appear that afternoon in his courtroom and to bring with them:

"Any and all original documents received by the United States mail on or about October 24, 1990, pertaining to the ongoing criminal trial of the (sic) *United States of America versus Charles J.*

*Porter, et al.*, including reports prepared by the Federal Bureau of Investigation, FD–302's, and the envelopes in which the documents were mailed."

The Order was obtained by the Government for the reason that it sought to procure the envelopes and reports from members of the news media, so that they could be examined to learn the identity of the party who distributed the FD–302's to the news media.

At the same time, a Grand Jury subpoena was issued purporting to require the news media to produce the same documents on October 30, 1990, before a Grand Jury sitting in the District. No Grand Jury was seated on October 25, 1990, which is the date that the first set of subpoenas was issued and served.

At the time scheduled for production of the documents in his Order, Judge Ziegler, on the Motion of the respondents, recused without taking any further action.

Judge Ziegler suggested the Government should consider presenting its Motion to another judge, either the Chief Judge or the Miscellaneous Judge.

Thereafter, on October 26, 1990, counsel for the Post–Gazette and its reporter, Michael Bucsko, both named as respondents in the subpoena, advised the Government that his clients had no documents responsive to the subpoena in that none of the documents had been received on or about October 24, 1990.

A second set of subpoenas *duces tecum* was served by the Government on November 6, 1990, upon the movants which required production of:

Any and all original documents received by [respondent's name] by United States mail pertaining to the Criminal trial of *United States of America v. Charles K. Porter, et al.*, at Criminal No. 90–35 in Pittsburgh, Pennsylvania, including Federal Bureau of Investigation reports (FD–302's) prepared by special Agent

---

**1.** All of the respondents except Janet Williams agree that the documents were received in the United States mail.

**2.** The Court is advised that the Department of Justice investigated the rumors relating to the retired Federal Judge when they first came to light, and has determined that they are baseless.

Roger Greenbank on January 21, 1988, or April 18, 1989, and the envelope in which the documents were mailed.

The Court, after a preliminary hearing on the Motions to Quash and after consideration of Motions of some of the respondents for an evidentiary hearing, scheduled an evidentiary hearing to commence December 20, 1990, so as to enable the parties to make a complete record should there be an appeal from the disposition of the Motions.

Prior to the evidentiary hearing, the Government filed a *Schofield* affidavit wherein it identified the legal bases for the Grand Jury investigation; that is, as a result of the distribution of the documents, it had probable cause to believe that the following offenses were committed: (i) obstruction of justice in violation of 18 U.S.C. § 1503; (ii) contempt of court in violation of 18 U.S.C. § 401; (iii) contempt of court in violation of 18 U.S.C. § 402; and (iv) theft of government property in violation of 18 U.S.C. § 641.

During the hearing, the Government offered testimony of three witnesses, Assistant United States Attorney Bruce Teitelbaum, FBI Agent Patricia Moriarty, and FBI Agent David Attenberger, a document examiner.

The Post–Gazette adduced testimony of Michael Bucsko who testified that he received a number of documents relating to the *Porter* trial from a person whose identity was known to him and to whom he had promised confidentiality.

The movants, other than the Pittsburgh Press, represented that they had received materials in the United States mail from an anonymous source.

Prior to the evidentiary hearing, by agreement of all the movants, the Court ordered the movants to preserve the FD–302's and the envelopes which they received pending the disposition of the Motions to Quash.

Other members of the news media, WTAE and the Greensburg Tribune Review also received copies of the FD–302's

in the mail but have voluntarily surrendered them to the Government.

## DISCUSSION OF ISSUES

In opposition to the Motions to Quash, the Government asserts (i) under *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), there is no journalist's privilege in Grand Jury proceedings; and (ii) were there such a privilege in Grand Jury proceedings, pursuant to applicable decisions of the Third Circuit, any such privilege must yield to the superior public interest of the government in investigating a threat to the fair administration of justice in a very important criminal case.

The Government stresses that the most significant fact in this litigation is that the subject matter of the subpoenas is "not oral testimony but rather the unknown physical evidence of possible criminal activity." (Government's Supplemental Memorandum for the United States.)

Moreover, the Government contends the news gatherer's privilege asserted here is tantamount to the attorney-client privilege which does not protect physical evidence, and cites 2 *Weinstein's Evidence*, § 501[03] at 501–44 (Matthew Bender, 1989) which states:

"If (a news reporter) has evidence of a crime, such as original documents and weapons, they should be turned over immediately."

Conversely, the movants principally argue, *inter alia*, that in the present circumstances, there being no competing constitutional interests, there is an absolute news gatherer's privilege; or alternatively, that when constitutional interests compete, the absolute privilege gives way to a qualified privilege whereupon the Court must apply a balancing test to determine the limits of the privilege, and, that on this record, the Government has failed to establish the criteria of that balancing test enunciated in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979), which must be met before a news gatherer can be compelled to disclose a confidential source.[3]

---

3. Some of the movants also advance the argument that there is no basis in fact or law to

The movants, other than the Post–Gazette, also assert that the privilege extends to the reports they received from an anonymous source because the proposed testing by the Government could establish the identity of the confidential source, that a confidential relationship may be created by implied confidences not merely express confidences and, in any event, the privilege arises by reason of statute.

Prior to the evidentiary hearing, the Court observed that the issue of journalist's privilege is controlled by one of three possible authorities: (i) the decision of the Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646; (ii) the qualified privilege rule adopted by the Third Circuit in *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979); or (iii) the Pennsylvania Shield Law, 42 Pa.C.S. § 5942.

At the conclusion of the hearing, the Court requested the parties to brief (i) the effect of the adoption of Rule 501, Federal Rules of Evidence, subsequent to the *Branzburg* decision; (ii) the civil-criminal distinction embodied in Rule 501; and (iii) the significance of the Pittsburgh Post–Gazette reporter's knowledge of the source and his promise of confidentiality.

## FINDINGS OF FACT

1. In the trial of *United States of America v. Charles J. Porter, et al.*, fifteen (15) defendants were charged in a 46 Count indictment; two pleaded guilty prior to trial, four were severed, and nine defendants were tried over an eight (8) week period on 46 counts alleging various types of criminal activity. (*See* generally, Government's Exhibit No. 1; Tr. at 9, 10, 15, December 20, 1990.)

2. Prior to the start of the *Porter* trial, the Honorable Donald E. Ziegler issued an Order, dated August 30, 1990, restricting the disclosure and/or dissemination of *Jencks* and *Brady* material to defense counsel, the defense team, or any defendant as provided by the Government in the *Porter* trial.[4] (*See* Government's Exhibit No. 2.)

3. Michael Bucsko is a reporter for the Pittsburgh Post–Gazette, a morning newspaper of general circulation in the Greater Pittsburgh area. (Tr. at 16, December 26, 1990.)

4. On or about one month prior to October 25, 1990, Mr. Bucsko received from a known source to whom he promised confidentiality, certain *Porter* trial documents including two Federal Bureau of Investigation Reports (FD–302's) prepared by Special Agent Roger Greenbank on January 21, 1988, and April 18, 1989. Mr. Bucsko is the only member of the media who alleges to know the identity of the individual who provided him with the copies of FD–302's. (Tr. at 15, 16, 17, December 26, 1990.)

5. The FD–302's received by Mr. Bucsko describe interviews with Marvin "Babe" Droznek, a witness called by the Government during the *Porter* trial. In those interviews, Droznek related rumors about corruption involving various public officials, including a retired Federal Judge who was the father of one of the prosecutors in the *Porter* trial. The Court previ-

---

support the Government's belief that criminal violations result from the distribution of the FD–302's. However, it would appear that this argument is foreclosed by *United States v. R. Enterprises, Inc., et al.*, —— U.S. ——, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991).

**4.** Judge Ziegler's Order reads as follows:
   AND NOW, this 30th day of August, 1990, upon consideration of the Government's Motion for Order Restricting Disclosure of Jencks/Brady Material to Third Parties,
   IT IS HEREBY ORDERED, ADJUDGED AND DECREED that all materials provided by the government to the defense pursuant to the Jencks Act Title 18, United States Code, Section 3500, and all materials provided by the govern-

ment to the defense pursuant to the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), are subject to the following restrictions:
   a. The Jencks/Brady materials may not be reproduced or duplicated in any manner without the prior approval of the Court.
   b. The Jencks/Brady materials may not be disseminated beyond the defendant, the attorneys for the defendant, and any investigators retained by the defendant for purposes of this case, without the prior authorization of the Court.
   All Jencks/Brady material must be returned to the United States Attorney's Office at the conclusion of the trial of this case.

ously had ruled that the information contained in the FD–302's of Marvin Droznek was irrelevant and inadmissible in the *Porter* trial for use during cross examination. (Tr. at 21, 22, 34, December 20, 1990.)

6. On the morning of October 25, 1990, after the defense had rested in the *Porter* trial and shortly before the time set for closing arguments, KDKA–TV reporter, Harold Hayes, contacted the Offices of the United States Attorney to inform the Government that he had received certain documents which pertained to the ongoing *Porter* trial. In fact, these documents were copies of the FD–302's in question. (Tr. at 16, 17, December 20, 1990.)

7. At or about the same time as KDKA–TV revealed that it was in possession of FD–302's, the Government learned that other media representatives also received copies of the reports in question. These media members were Michael Bucsko, reporter for the Pittsburgh Post–Gazette, Janet Williams, reporter for the Pittsburgh Press, Jim Urban, reporter for the Greensburg Tribune Review, and WPXI–TV, a subsidiary of Cox Broadcasting. (Tr. at 23, December 20, 1990.)

8. On the morning of October 25, 1990, United States Attorney Thomas Corbett informed Judge Ziegler that he had been contacted by KDKA–TV regarding its possession of certain FD–302's. Based upon the information Corbett received, the Government filed a Motion for Immediate Production of Documents under the caption of the *Porter* case with the dual aim of preserving the integrity of the judicial proceeding and aiding the Government's investigation into the circumstances surrounding the disclosure of these documents. (Tr. at 16, 17, 18, December 20, 1990.)

9. Prior to 1:30 p.m. on October 25, 1990, subpoenas *duces tecum* returnable on October 30, 1990, were issued to "Mike Bucsko or the Pittsburgh Post Gazette,

Westinghouse Broadcasting or Harold Hayes, Janet Williams or the Pittsburgh Press, and Cox Broadcasting." The subpoenas read as follows:

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

Any and all original documents received by (movant's name) by United States Mail on or about October 24, 1990, pertaining to the ongoing criminal trial of *United States of America v. Charles J. Porter, et al.*, in Pittsburgh, Pennsylvania, including reports prepared by the Federal Bureau of Investigation (FD–302's) and the envelope in which the documents were mailed.[5]

(*See* Movants' Exhibits "D", "H", "J", and "B").

10. On October 25, 1990, at approximately 1:30 p.m., the Government secured an *ex parte* Order signed by the Honorable Donald E. Ziegler requiring Mr. Bucsko and various other members of the media to appear at 4:30 p.m. that afternoon in Judge Ziegler's courtroom and to bring with them:

"... any and all original documents received by United States Mail on or about October 24, 1990, pertaining to the ongoing criminal trial of the [sic] United States of America v. Charles Porter, et al., including reports prepared by the Federal Bureau of Investigation (FD–302's) and the envelopes in which they were mailed."

(*See* Movants' Exhibit "A.")

11. As of 4:30 p.m. on October 25, 1990, the Government had not met with the affected members of the media which is mandated by the policy set forth in 28 C.F.R. § 50.10(c)[6] regarding the undertaking of negotiations with the media prior to the issuance of a subpoena to a media member. (Tr. Stipulation at 100.)

---

**5.** A Stipulation entered into by the parties indicates that "[N]o federal grand jury was sitting in Pittsburgh on October 25 or 26, 1990."

**6.** (c) Negotiations with the media shall be pursued in all cases in which a subpoena to a member of the news media is contemplated. These negotiations should attempt to accommo-

date the interests of the trial or grand jury with the interests of the media. Where the nature of the investigation permits, the government should make clear what its needs are in a particular case as well as its willingness to respond to particular problems of the media.

12. All counsel in the *Porter* trial appeared before Judge Ziegler and were asked individually by the Court whether or not they had any knowledge or in any way participated in the dissemination of the information covered by the Court's August 30, 1990 protective Order. Those counsel who appeared before the Court to participate in the colloquy were:

a. For the Government: Linda L. Kelly, First Assistant United States Attorney, Craig R. McKay, former Chief of the Criminal Division, Bruce J. Teitelbaum, Special Litigation Counsel to the United States Attorney, Leo M. Dillon, Chief of the Criminal Division and Stephen R. Kaufman, Assistant United States Attorney.

b. For the Defendants: Melvin Schwartz, Esquire and Harold Gondelman, Esquire, for defendant Charles Porter, Thomas Ceraso, Esquire, for defendant Raucci, Carl Max Janavitz, Esquire, for defendant Chiarelli, Thomas Brown, Esquire, for defendant Durish, Patrick Thomassey, Esquire, for defendant William Porter, Lee Markovitz, Esquire, for defendant Levie, Sally A. Frick, Esquire, for defendant Sosa, Stanton D. Levenson, Esquire, for defendant Rosenfeld, and Caroline Roberto, Esquire, for defendant Carrabba.

Marilyn G. Brown was the Official Reporter. (*See* Government's Exhibit No. 3.)[7]

13. Two questions were asked of all counsel present:

(a) Did you violate the Order of the Court?

(b) Do you have any knowledge concerning the violation of the Order of this Court?

All counsel responded in the negative. (*See* Government's Exhibit No. 3.)

14. The Government made no attempt to question under oath the various *Porter* trial defendants, counsels' defense teams or their support staffs with regard to any information they might possess concerning the disclosed FD–302's. Nor did the Government subpoena those parties to appear before Judge Ziegler or otherwise question under oath members of its own office staff who might reasonably have been expected to come into contact with the FD–302's at issue. (Tr. at 44, 45, December 20, 1990.)

15. Defense counsel in the *Porter* trial returned 12 copies of the FD–302's which was the exact number of copies released to them. (Tr. at 52, December 20, 1990.)

16. At the hearing before Judge Ziegler, counsel for the Pittsburgh Post–Gazette motioned for his recusal which was joined by other movants' counsel. Judge Ziegler granted the motion and suggested that the government might pursue a hearing on the possible issue of contempt raised in their Motion to Compel Immediate Production of Documents before the Chief Judge or the Miscellaneous Judge. (Stipulation at Docket No. 7.)

17. The Government did not seek to present its Motion to another judge. However, the United States Attorney met with counsel for the news media and all news media counsel agreed to preserve the FD–302's reports they received. (Stipulation at Docket No. 7.)

18. On October 26, 1990, the Government notified counsel for the movants in this matter that the pending Grand Jury subpoenas would be held in abeyance pending steps to obtain the authorization of the Attorney General under Title 28 Federal Code of Regulations, Section 50.10.[8] Thereafter, the Government made no effort

---

7. Ms. Kelly and Mr. McKay presented the Government's oral Motion to the Court to conduct a colloquy in the matter of the dissemination and duplication of the FD–302's. Ms. Kelly and Mr. McKay did not take part in the colloquy.

8. § 50.10 Policy with regard to the issuance of subpoenas to members of the news media, subpoenas for telephone toll records of members of the news media, and the interrogation,

indictment, or arrest of members of the news media.

Section 50.10 in relevant part reads:
(b) All reasonable attempts should be made to obtain information from alternative sources before considering issuing a subpoena to a member of the news media ...
(f)(4) The Government should have unsuccessfully attempted to obtain the information from alternative nonmedia sources.

to renew its Motion for Immediate Production of Documents. (Stipulation at Docket No. 7.)

19. On October 26, 1990, counsel for Mr. Bucsko and the Post–Gazette informed the Government that his clients had no documents responsive to the subpoena, specifying that none of the documents in their possession had been received on or about October 24, 1990. (Movants' Exhibit "F.")

20. On November 6, 1990, a second subpoena, returnable on November 7, 1990, was served upon Mr. Bucsko or the Pittsburgh Post–Gazette, Harold Hayes or KDKA–TV, Janet Williams or the Pittsburgh Press, and WPXI, Cox Broadcasting Corporation, which required production of:

Any and all original documents received by [respondent's name] by United States mail pertaining to the Criminal trial of *United States of America v. Charles J. Porter, et al.*, at Criminal No. 90–35 in Pittsburgh, Pennsylvania, including Federal Bureau of Investigation reports (FD–302's) prepared by special Agent Robert Roger Greenbank on January 21, 1988, or April 18, 1989, and the envelope in which the documents were mailed.

(Movants' Exhibits "G", "L", "K", "I".)

21. In the case *United States of America v. William Kostrick and Dino Romano, et al.*, Criminal No. 88–66, Western District of Pennsylvania, copies of the FD–302's in question were distributed to defense counsel Gary Zimmerman, Esquire, and Kerry O'Malley, Esquire, Ronald Plisko, a co-defendant in the *Kostrick* case, his counsel, Joel Hirschhorn, Esquire, who practices in Miami Florida, his co-counsel, John Doherty, Esquire, and Thomas Dawson, Esquire, a post-conviction specialist with offices in Leavenworth, Kansas. (Tr. at 27, 39, 40, December 20, 1990). (Tr. at 20, 21, 26, 27, December 20, 1990.)

22. In the *Kostrick/Romano* case, there was an oral protective Order issued by the Honorable Alan N. Bloch restricting the dissemination or disclosure of the materials received by Gary Zimmerman, Esquire, Kerry O'Malley, Esquire, Joel Hirschhorn, Esquire, John Doherty, Esquire, Thomas Dawson, Esquire, and their defense teams. It is inconclusive whether or not defendants Kostrick, Romano, and Plisco were subject to or informed of Judge Bloch's Order. (Tr. at 30, December 20, 1990.)

23. Neither defense counsel, nor any defendant nor any member of the defense counsels' teams or support staffs, who were involved in the *Kostrick/Romano* case, were questioned under oath regarding their roles, if any, in the dissemination or disclosure of the FD–302's in question, nor were they subpoenaed by the Government to appear before Judge Ziegler to participate in the Court's colloquy, nor did they receive grand jury subpoenas similar in form and substance to those received by the movants. (Tr. at 27, 39, 40, December 20, 1990.)

24. No verifiable communication was solicited, nor received, by the Office of United States Attorney to determine whether defense counsel in the *Kostrick/Romano* case, counsels' support staffs, their defense teams, or the remaining defendants themselves, disclosed or had any knowledge regarding the disclosure and/or dissemination of the FD–302's at issue. Moreover, these individuals were not subpoenaed by the Government to appear before the Court to participate in a colloquy under oath. (Tr. at 39, 40, 66, 67, 69, 70, 72, 74, December 20, 1990.)

25. The Government did receive back the same number of copies of the FD–302's it had released to defense counsel Gary Zimmerman, Esquire, and Kerry O'Malley, Esquire, which, in turn, were destroyed by the Government. (Tr. at 38, December 20, 1990.)

26. There is no specific procedure in the Office of the United States Attorney for the handling of *Jencks* material once it is returned to a representative of that office. (Tr. at 101.)

27. Prior to the hearing held on November 8, 1990, the Government filed a *Schofield* affidavit wherein it identified the legal bases for the Grand Jury investigation; that is as a result of the distribution of the

documents it had probable cause to believe that the following offenses were committed; Obstruction of Justice, in violation of 18 U.S.C. § 1502, Contempt of Court in violation of 18 U.S.C. § 401, Contempt of Court in violation of 18 U.S.C. § 402, and Theft of Government Property in violation of 18 U.S.C. § 641.

28. On November 8, 1990, the Court conducted a hearing whereupon it entertained the following Motions:

(A) Motion to Postpone and to Quash Subpoena Duces Tecum filed by Janet Williams and the Pittsburgh Press Company at Miscellaneous No. 16973;

(B) Motions for Postponement and to Quash Subpoena filed by Michael Bucsko and PG Publishing Co., t/d/b/a the Pittsburgh Post–Gazette, at Miscellaneous No. 16974; and

(C) Motion to Postpone and to Quash Subpoena filed by WPXI, Inc., at Miscellaneous No. 16975.

At the conclusion of the hearing, the Court Ordered that the appearance of Michael Bucsko, the Pittsburgh–Post Gazette, Janet Williams, the Pittsburgh Press Company, WPXI, Inc., and Cox Broadcasting Corporation, before the Grand Jury of the United States District Court for Western Pennsylvania on November 7, 1990, at 1:30 p.m., was postponed pending further Order of Court.[9] The Court further ordered petitioners to respond to the Government's Memorandum on Grand Jury Subpoenas for Documents. (*See* Order of Court at Docket No. 2., Misc. No. 16973.)

29. At some time after October 25, 1990, but prior to the commencement of the evidentiary hearing held on December 20, 1990, WTAE–TV and the Greensburg Tribune Review voluntarily produced to the Government the documents which were the subject of the November 6, 1990 subpoena. (Tr. at 121, 151, December 20, 1990.)

30. On December 20, 1990, the Court commenced an evidentiary hearing on the matter of the Grand Jury subpoenas *duces tecum* issued to movants on November 6, 1990. Other than the movants, no other individual was subpoenaed by the Government to appear for this evidentiary hearing. (See Movants' Exhibits "G", "L", "K", "I.")

31. Bruce Teitelbaum, (Teitelbaum) the lead Assistant United States Attorney in the trial of Charles Porter was the first of three Government witnesses. (*See* generally Tr. 7–103.)

32. Teitelbaum, now special litigation counsel to the United States Attorney, "handled" the investigation of the *Porter* trial, which dates back to 1983. Teitelbaum, along with Assistant United States Attorneys Steve Kaufman and Leo Dillon prepared all documents leading up to the Grand Jury indictment. (Tr. at 8, 9, December 20, 1990.)

33. The preparation of the FD–302's, which entails both the typing and copying of the same, was performed by a number of identified and unidentified staff support personnel from the Pittsburgh Offices of the United States Attorney and the FBI. (Tr. at 65, 66, December 20, 1990.)

34. To date, there has been no internal investigation by the Government with the aim of ruling out the possibility that the FD–302's were stolen or otherwise procured from the Pittsburgh offices of the United States Attorney or the FBI. (Tr. at 66, 67, December 20, 1990.)

35. There is no particular protocol required by the FBI concerning the course if the investigation in this matter. (Tr. at 132.)

36. The FBI has a record of every individual to whom the FD–302's were distributed. (Tr. at 114, December 20, 1990.)

37. While the Government concedes that other avenues of investigation remain open in its attempt to identify person(s) who distributed the FD–302's, the decision not to pursue these avenues was made by Case Agent Moriarity based upon her "experience as an investigator and relying on the experience of other investigators" with the aim of minimizing damage to the inves-

---

**9.** Westinghouse Broadcasting Company, Inc., t/d/b/a/KDKA–TV filed its Motion to Quash Subpoena and a supporting Brief on November 14, 1990.

tigation should other avenues of inquiry be pursued. (Tr. at 133, 138, 139, December 20, 1990.)

38. The Government has neither conducted interviews nor has any plans to conduct any investigation until it receives all media held FD–302's. (Tr. at 112, 114, December 20, 1990.)

39. Case agent Moriarity has an unidentified suspect for the purported crimes along with a "known sample," i.e. an envelope, belonging to the Government's single suspect. (Tr. at 105, 106, 109, 110, December 20, 1990.)

40. David Attenberger, an FBI document examiner, testified as to the types of tests hypothetically possible which could be performed on the FD–302's since he had not yet received those documents surrendered by the Greensburg Tribune Review and WTAE–TV. (Tr. at 168–172.)

41. As of December 20, 1990, David W. Attenberger, who has been assigned to this case, had not received nor had been asked to conduct any tests on the surrendered FD–302's or the suspect's envelope. (Tr. at 179, December 20, 1990.)

42. The investigation would be aided by the performance of a number of non-destructive tests on the two "unknown samples" and the "known sample" including tests of the handwriting, typewriting, type of photocopier, type of paper, and postage stamps without impairing their investigative or evidentiary value. (Tr. at 180–186.)

43. The Government has failed to advance a single scientific theory or authority in support of its assertion that all media held FD–302's *must* be tested at the same time in order to determine their source.[10]

## LEGAL DISCUSSION

As a starting point, the Court finds it important to describe the function of a Grand Jury and the nature of its proceedings.

In *United States v. R. Enterprises, Inc., et al.,* —— U.S. ——, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991), the Court described the role of the Grand Jury as follows:

"The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike the court, whose jurisdiction is predicated on a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' *United States v. Morton Salt Co.,* 338 U.S. 632, 642–643 [70 S.Ct. 357, 363–364, 94 L.Ed. 401] (1950). The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. 'A grand jury investigation "is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed."' *Branzburg v. Hayes,* 408 U.S. 665, 701 [92 S.Ct. 2646, 2666, 33 L.Ed.2d 626] (1972) quoting *United States v. Stone,* 429 F.2d 138, 140 (CA2, 1970)."

Moreover, the Court distinguished a Grand Jury subpoena from a criminal trial subpoena as follows:

"A grand jury subpoena is thus much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged. '[T]he identity of the offender, and the precise nature of the offense, if there be

---

**10.** In it Supplemental Memorandum, the Government states:

"There is at least one suspect, but Agent Moriarity testified that the suspicion is based largely upon motive (12/20/90 Tr. 150), and that approaching him or her now may result in the loss of evidence. (12/20/90 Tr. 160). Also, the Government does have two sets of reports and envelopes and a known sample from the suspect. The case agent and an FBI document expert testified, however, that conducting tests on these items now *may make it difficult to compare them to the outstanding sets of reports and envelopes.*" (12/20/90 Tr. 108–109, 163–165, 170.) (Emphasis added.)

one, normally are developed at the conclusion of the grand jury's labors, not at the beginning.'" *Blair v. United States,* 250 U.S. 273, 282 [39 S.Ct. 468, 471, 63 L.Ed. 979] (1919). In short, the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists. See *Hale v. Henkel,* 201 U.S. 43, 65 [26 S.Ct. 370, 375, 50 L.Ed. 652] (1906). *Id.* at 111 S.Ct. at 726.

Further, the Court stated:

"A grand jury 'may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.'" *Id.* at 726.

With regard to limits of the Grand Jury powers, the Court also stated:

"The investigatory powers of the grand jury was nevertheless not unlimited. See *Branzburg, supra,* [408 U.S.] at 688 [92 S.Ct. at 2660]; [*United States v.*] *Calandra, supra,* [414 U.S. 338] at 346 and n. 4 [94 S.Ct. 613, 619 and n. 4, 38 L.Ed.2d 561 (1974)]. Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass. In this case, the focus of our inquiry is the limit imposed on a grand jury by Federal Rule of Criminal Procedure 17(c), which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings. The Rule provides that 'the court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.'

"This standard is not self-explanatory. As we have observed, 'what is reasonable depends on the context.' *New Jersey v. T.L.O.,* 469 U.S. 325, 337 [105 S.Ct. 733, 740, 83 L.Ed.2d 720] (1985)." *Id.* 111 S.Ct. at 727.

■ A Federal Grand Jury proceeding is a criminal proceeding notwithstanding that

it may result in either civil or criminal contempt citations. *Matter of Grand Jury Empaneled,* 597 F.2d 851 (3d Cir.1979). *Cf. Lee v. Johnson,* 799 F.2d 31 (3d Cir. 1986); *Ochoa v. United States,* 819 F.2d 366 (2d Cir.1987); *United States v. Ryan,* 810 F.2d 650 (7th Cir.1986).

## THE GOVERNMENT'S CONTENTION THAT UNDER *BRANZBURG,* THERE IS NO NEWS GATHERER'S PRIVILEGE IN THE CONTEXT OF A FEDERAL GRAND JURY PROCEEDING

■ Various Courts subsequent to the *Branzburg* decision have interpreted it to hold that there is a news gatherer's privilege which would prevent the compelled disclosure of his/her source.

Nevertheless, the adoption of Rule 501, Federal Rules of Evidence, would appear to negate the present viability of the Government's interpretation of *Branzburg.*

Effective June 1, 1975, Federal Rule of Evidence 501 provides in pertinent part that:

"Privilege(s) ... shall be governed by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience."

Recently, in the case of *In re Grand Jury Investigation,* 918 F.2d 374 at 378 and 379 (3d Cir.1990), the Third Circuit commented on that Rule as follows:

"In federal courts, evidentiary privileges are governed by Rule 501 of the Federal Rules of Evidence. This provision, which was the product of Congressional involvement in the rule-making process, does not contain a specific and exclusive list of privileges recognized in the federal courts. The Rule instead provides the federal courts with flexibility and crafting testimony privileges....

"The Rule dictates the evolution and application of a federal common law of privilege in federal criminal cases. *Under Federal Rule of Evidence 1101, Rule 501 is applicable to Grand Jury proceedings. See* Fed.R.Evid. 1101(d)(2)

(providing that all rules of evidence shall be inapplicable in Grand Jury proceedings except for that with respect to privileges.)"[11] (Emphasis supplied.)

Significantly, the Third Circuit stressed that:

"Both the history and the language of 'Rule 501' therefore provide us with a mandate to develop evidentiary privileges in accordance with common law principles. This mandate, in turn, requires us to examine federal and state case law and impels us to consult treatises and commentaries on the law of evidence that elucidate the development of the common law." *Id.* at 379.

Since *Branzburg* and the adoption of Rule 501, the Third Circuit has unequivocally recognized a journalist's qualified federal common law privilege to refuse to divulge his or her sources. *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979) (civil contempt citation of reporter in civil trial for refusing to identify source); *United States of America v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980) (television network adjudged to be in civil contempt for failing to comply with court Order directing it to submit certain materials to the Court for *in camera* inspection prior to a criminal trial); *United States of America v. Criden*, 633 F.2d 346 (3d Cir.1980) (journalist cited for civil contempt in criminal trial for refusal to affirm or deny that she had a conversation with the United States Attorney for the Eastern District of Pennsylvania who had already publicly testified the conversation occurred and that certain matters relevant to a government investigation were discussed).

■ In the pivotal decision of the Third Circuit in *Riley v. City of Chester, supra*, the Court held that a reporter who had been called as a witness in a civil suit would be required to disclose the source of her story and instructs us that in order to overcome a journalist's qualified privilege, the moving party must meet three criteria:

"First, the movant must demonstrate that he has made an effort to obtain the information from other sources.

"Second, he must demonstrate that the only access to the information sought is through the journalist and her sources.

"Finally, the movant must persuade the court that the information sought is crucial to the claim." *U.S. v. Criden, supra* at 359.

In *Criden*, the defendants moved to dismiss their indictments on the basis of outrageous prosecutorial misconduct involving leaks to the news media concerning the ABSCAM investigation which leaks, admittedly, came from within the Government.

It is notable that in recognizing a journalist's privilege in a criminal trial in the light of the *Branzburg* decision, the Third Circuit said:

"This Court has taken a more reasonable view of the balance between the privilege and a criminal defendant's rights. We have previously adopted the formulation and the concurring Opinion of Justice Powell in *Branzburg:* the asserted claim to privilege should be judged on its facts by striking a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.* at 357.

The Court also emphasized:

"This Court has held flatly that journalists have a federal common law privilege, albeit qualified, to refuse to disclose their confidential sources. *Riley v. City of Chester*, 612 F.2d. 708, 715 (3d Cir. 1979)." *Id.* at 355.

The Court in *Criden* stresses that the reasons underpinning the news gatherer's

---

**11.** *In re Grand Jury Investigation* involved the appeal by the Government, pursuant to 18 U.S.C. § 3731 from an Order denying its Motion to compel the Federal Grand Jury testimony of a Lutheran clergyman concerning subjects discussed during a family counseling session. The District Court held that a clergy-communicant privilege, existing under federal common law, barred the testimony.

privilege have societal value in furthering the flow of public information that "more likely than not would result if confidential news sources had to be identified," and, further appraises its importance:

"... A journalist does in fact possess a privilege that is deeply rooted in the First Amendment. *When no countervailing constitutional concerns are at stake, it can be said that the privilege is absolute;* when constitutional precepts collide, the absolute gives way to the qualified and a balancing process comes into play to determine its limits." *Id.* at 356. (Emphasis supplied.)

## NEWS GATHERERS' CONTENTION THAT THERE IS AN ABSOLUTE PRIVILEGE

■ The movants contend the Court must find there is an absolute privilege that bars their compelled production of the FD–302's because there are no countervailing constitutional concerns and, therefore, under the teachings of *Criden, supra,* this Court must quash the subpoenas *duces tecum.*

In *Branzburg,* commenting on the role of the Grand Jury, the Court stated:

"Grand Jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes, and 'its constitutional prerogatives are rooted in long centuries of Anglo–American history.'" *Id.* 408 U.S. at 687, 92 S.Ct. at 2659.

Assuming the competing interests of the Government in investigating possible crime through the Grand Jury does not rise to the level of a countervailing constitutional concern, which this Court is unwilling to conclude, nonetheless, this Court is compelled to conclude the competing interests of the Government are of such a vital concern that they must negate the finding of an absolute privilege here.

Therefore, this Court finds that under the circumstances on which this proceeding is bottomed, there arises no absolute news gatherer's privilege.

■ Consequently, the Court must apply the *Riley* analysis to the facts of the instant proceeding to determine whether the qualified news gatherers' privilege should yield to the Government's interest.[12]

## THE GOVERNMENT HAS FAILED TO MEET THE RILEY CRITERIA

■ The Government has failed to meet two of the *Riley* criteria: (i) the Government must demonstrate it has made an effort to obtain the information from other sources; and (ii) the Government must demonstrate the only access to the information sought is through the journalist and his/her sources.

The Government has not demonstrated that it has made an effort to obtain the information from other known sources.

In its brief, the Government argues: "there are no reasonable alternative avenues of investigation and that the only conceivable alternative would be to interview every one of the hundreds of persons employed in Pittsburgh by the United States Attorney's Office, the Internal Revenue Service, the Federal Bureau of Investigation and the defense teams in the *Porter* case."

Further, it asserts, "there is no evidence that such a needle-in-a-haystack approach would be feasible."

Based on testimony of the Government's own witnesses, the Court must conclude that not only is the Government's effort to obtain the information from other sources feasible, but it is also necessary.

Patricia Moriarty ("Agent Moriarty"), the FBI agent in charge of the investigation, testified that not only does she have a suspect for the purported crimes, but she also has a "known sample," that is, an

---

**12.** A privilege may be invoked by a news gathering agency, in addition to a person engaging in news gathering dissemination. *U.S. v. A.V. Cuthbertson,* 630 F.2d 139 (3d Cir.1980); *Gulliver's Periodicals v. Charles Levy,* 455 F.Supp. 1197 (N.D.Ill.1978). Moreover, the privilege applies to information or documents which might lead to identification of confidential sources. M. Larkin, Federal Testimonial Privilege (1990), footnote 19 at p. 8–5.

envelope from the suspect to use for purposes of comparison with the FD–302's and the envelopes in which they were mailed which the Government has received from WTAE–TV and the Greensburg Tribune Review.

Moreover, Agent Moriarty conceded she has available various investigatory avenues requiring minimal effort or expense which she had not performed. She also admitted that she had not requested a list of everyone to whom the Government had distributed the FD–302's. She also conceded that the FBI's technical laboratory could perform some physical comparisons of the documents without impairing their evidentiary value and that these procedures might disclose whether the suspect had, in fact, sent the FD–302's to WTAE–TV and the Greensburg Tribune Review. She had not requested the FBI laboratory to perform any of the non-destructive tests for the reason that she wanted to gather all of the physical evidence before sending it on to the laboratory. In addition, she had not yet initiated any investigation of the suspect's involvement in the purported crimes identified in the Government's *Schofield* affidavit.

Significantly, Agent Moriarty also testified if she does not obtain the subpoenaed FD–302's, then she can pursue other avenues of investigation, but presently she had no plans to expand her investigation beyond the scope of the subpoenas issued on November 6, 1990.

David Attenberger ("Attenberger"), an FBI document examiner called by the Government, testified with regard to tests hypothetically possible since he had not yet seen any of the documents.

He confirmed that Agent Moriarty had not asked him to conduct any of the non-destructive tests which he could perform without altering the documents. For example, he could compare documents on the basis of handwriting, typewriting, type of photocopier, type of paper and postage stamps, without impairing their evidentiary or investigative value, and indicated that these tests could very well assist Agent Moriarty in her investigation. As suggested by some of the movants, it also occurs to the Court that Attenberger could examine the suspect's envelope and the FD–302's obtained from WTAE–TV and the Greensburg Tribune Review to determine if they were sent by the same person.

More importantly, he could first perform the non-destructive tests, and then take photographs to record the test results and then subsequently perform the tests that alter the documents, such as latent fingerprint tests.

It would appear to this Court that it would not be unreasonable to require the Government to first exhaust its investigation of those persons, though numerous, who did have access to the FD–302's before seeking production of the documents here.

In *Zerilli v. Smith*, 656 F.2d 705 at 714 (D.C.Cir.1981), in discussing the need of litigants to obtain information from alternative sources where they seek to compel discovery of a journalist's news sources, the Court referred to its earlier decision in *Carey v. Hume*, 492 F.2d 631 (D.C.Cir. 1974), *cert. denied*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974) where it suggested that an alternative to compelling disclosure of a news gatherer's source requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compel disclosure. *Id.* at 714. Compare *In re Roche*, 448 U.S. 1312, 101 S.Ct. 4, 65 L.Ed.2d 1103 (1980), where Mr. Justice Brennan, sitting as a Circuit Justice, granted an application for a stay of enforcement of a civil contempt citation for refusal of the applicant to disclose identities of news sources where the applicant was among 65 witnesses to be called by a Commission investigating alleged misconduct by a State District Court Justice.

Therefore, this Court finds that because the Government has unquestioningly failed to establish the necessary *Riley* criteria in that it has made no effort to obtain the information from other sources, it must hold that the movants' qualified privilege is not overridden and that the Motions to Quash must be granted.

Courts should tread lightly whenever the First Amendment interests of news gather-

ers are implicated. When the Court puts the respective interests of the Government and the movants in perspective, it readily reaches the exact conclusion the Court reached in *Zerilli, supra:*

> "The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as the end, not the beginning of the inquiry." *Id.* at 713.

In arriving at its decision, this Court has also considered § 50.10 of 28 Code of Federal Regulations, entitled "Policy with regard to the issuance of subpoenas to members of the news media, subpoenas for telephone toll records of members of the news media, and the interrogation, indictment, or arrest of, members of the news media," which provides in pertinent part:

> "Because freedom of the press can be no broader than the freedom of reports to investigate and report the news, the prosecutory power of the Government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues. This policy statement is thus intended to provide protection for the news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function.
>
> "All reasonable attempts should be made to obtain information from alternative

sources before considering issuing a subpoena to a member of the news media, ..." (b)

"The Government should have unsuccessfully attempted to obtain the information from alternative non-media sources." (f)(3) 28 C.F.R., § 50.10

It is manifestly clear that the Government has not discharged the obligation imposed by these regulations.[13]

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

(1) There is a qualified news gatherer's privilege against compelled disclosure of his or her news sources in a Grand Jury proceeding.

(2) The interests of the Government in investigating crime through a Grand Jury proceeding is of such a vital concern that it may override a competing news gatherer's privilege against compelled disclosure of his or her sources.

(3) In order to overcome the news gatherer's privilege against compelled disclosure of his or her sources, the Government must establish the criteria set forth in *Riley v. City of Chester, supra,* which are as follows:

> First, the movant must demonstrate that he has made an effort to obtain the information from other sources.

---

**13.** At footnote 14 of the Court's Opinion in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), a case dealing with Regulations in the Internal Revenue Service Manual which prohibit "consensual electronic surveillance" between taxpayers and IRS agents unless certain specified prior authorization is obtained, the Court writes:

> It does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them [regulations]. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). *See* e.g., *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (holding habeas corpus relief proper where Government regulations "with the

force and effect of law" governing the procedure to be followed in processing and passing upon an alien's application for suspension of deportation were not followed); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (invalidating Secretary of State's dismissal of an employee where regulations requiring approval of the Deputy Undersecretary and consultation of full record were not satisfied); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (invalidating dismissal of Interior Department employee where regulations governing hearing procedures for national security dismissals were not followed). *See* also *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (reversing contempt conviction where congressional committee had not complied with its rules requiring it to consider a witness' request to be heard in executive session) its own regulations.

Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the court that the information sought is crucial to the claim.

(4) A news gathering agency, as well as a news gathering person, may raise the privilege in a Grand Jury proceeding.

(5) The privilege prevents the compelled production of information or documents which may disclose the identification of an anonymous news source.

(6) An implied confidential relationship can arise out of the circumstances where documents are distributed to a news gatherer by an anonymous news source,[14] and there need not be an explicit promise of confidentiality for the news gatherer to invoke his or her privilege.

(7) The Government has failed to establish criteria necessary to overcome the movants' qualified privilege against compelled production of the documents described in the subpoenas *duces tecum.*

---

**14.** [T]here is a general expectation in certain sectors of society that information flows more freely from anonymous sources ... The rule protecting a journalist's source therefore does not depart significantly from daily experience in informal dissemination of information. *U.S. v. Criden, supra,* at 356.